687 S.E.2d 382

**Brenda Diane WARE, Petitioner Below, Appellee and Cross–Appellant**

v.

**David Gary WARE, Respondent Below, Appellant and Cross–Appellee.**

No. 34720.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 7, 2009.

Decided Nov. 23, 2009.

Douglas A. Cornelius, Esq., Clarksburg, WV, for Appellant/Cross Appellee.

Delby B. Pool, Esq., Amy Lanham, Esq., Clarksburg, WV, for Appellee/Cross Appellant.

WORKMAN, Justice:

In this divorce action, Appellant and Cross–Appellee David Gary Ware appeals the April 9, 2008, judgment of the Circuit Court of Harrison County, West Virginia. Mr. Ware contends that the circuit court erred in affirming the conclusion of the Family Court of Harrison County, West Virginia, that certain property acquired after his marriage to Appellee and Cross–Appellant Brenda Diane Ware was not protected by a prenuptial agreement. He further asserts that the circuit court erred in adopting the family court's valuation of that property. Mrs. Ware presents several cross-assignments of error alleging that the circuit court erred by (1) reversing the family court's finding that the prenuptial agreement is null and void, (2) denying her the benefit of any increase in the value of certain property owned by her husband prior to the marriage, (3) refusing her request for alimony, and (4) refusing her request for costs and attorney's fees. For the reasons more fully set forth herein, the Court reverses the circuit court's Order.

## I.

### FACTS AND PROCEDURAL HISTORY

After living together for nearly two years, the parties married in February 1993, when Mrs. Ware was twenty-three years old and Mr. Ware was twenty-eight. At that time, Mrs. Ware, then known as Brenda Diane Ayers, was working as an X-ray technologist. Mr. Ware was working at a pizza restaurant at the Meadowbrook Mall in Bridgeport,

West Virginia, called "The Pizza Place of Bridgeport, Inc." (hereinafter "the Pizza Place"), of which he owned a 49% share.

Several months before their wedding, Mr. Ware asked an attorney, Keith Skeen, to draft a prenuptial agreement to protect his interest in the Pizza Place. On February 10, 1993, approximately ten days before their wedding date, Attorney Skeen met with the parties at the Pizza Place and presented them with a draft agreement. Although Mr. Ware contends that he had previously discussed entering into such an agreement with his bride-to-be, Mrs. Ware denies having had any knowledge of the agreement prior to that day.

At that meeting, both parties read the proposed agreement for the first time. Mrs. Ware objected to a provision relating to a waiver of alimony and Mr. Ware agreed to remove it. Attorney Skeen revised the agreement and, on the following day, the parties signed the "Ante–Nuptial Agreement" (hereinafter "the Agreement") at Attorney Skeen's office. Among other things, it provides that

> The Pizza Place franchise located at the Meadowbrook Mall, Bridgeport, Harrison County, West Virginia, owned by **DAVID GARY WARE** and John Geraffo as co-owners will remain the property of **DAVID GARY WARE. BRENDA DIANE AYERS** releases all rights that she could or might have, by reason of marriage, in the Pizza Place franchise located at Meadowbrook Mall, Bridgeport, Harrison County, West Virginia as well as any future acquisitions of Pizza Place franchises.

Agreement, ¶ 2.

At the same meeting in which they signed the Agreement, both parties also signed two documents entitled "Certification of Attorney." In those documents, of which one pertains to Mr. Ware and one to Mrs. Ware, Attorney Skeen certified that he had consulted with each of the parties and advised each of his or her legal rights. For example, the "Certification of Attorney" relating to Mrs. Ware states:

> I, Keith Skeen, certify that I am a duly licensed attorney, admitted to practice in the State of West Virginia; that I have consulted with **BRENDA DIANE AYERS,** a party to the foregoing instrument, and that I have fully advised her of her property rights and of the legal significance of the foregoing Agreement; that she has acknowledged a full and complete understanding of the legal consequences of the terms and provisions of the foregoing Agreement and has freely and voluntarily executed the Agreement in my presence.

It is dated February 11, 1993, and signed by Keith Skeen, David Ware and Brenda Ayers. An identical "certification" pertaining to Mr. Ware was also signed and dated the same day.

Shortly after they married, Mr. Ware and his business partner purchased, as a subsidiary of the Pizza Place, a candy store called "Sweets and Treats." Mrs. Ware quit her X-ray technician job to run the store, and Mr. Ware later testified that he considered it to be "Brenda's business." After five years, however, the Wares decided not to renew the lease for Sweets and Treats so that Mrs. Ware could stay home to raise their children.

Throughout the marriage, which lasted approximately twelve years, Mr. Ware acquired interests in a number of additional businesses. He and his business partner from the Pizza Place started several additional pizza corporations in other locations, most of which dissolved within a few years. In 2001, Mr. Ware "bought out" his partner's 51% interest in the Pizza Place using his share of stock in two of the other pizza corporations, as well as $18,500.00 cash.

On July 21, 2005, Mrs. Ware filed for divorce alleging cruelty and abandonment. The parties entered into a Mediated Agreement on October 15, 2005, dividing all the marital property. A dispute arose, however, over the division of the Pizza Place. Mr. Ware asserted that, pursuant to the Agreement, the business was his separate property, while Mrs. Ware argued that the Agreement was invalid, and thus the business should be considered marital property.

On December 16, 2005, the family court conducted a hearing on the validity of the Agreement, at which time Mr. Ware testified that he had obtained the Agreement in order

to protect his and his business partner's interests in the Pizza Place. At the same hearing, Mrs. Ware testified that she signed the Agreement because Mr. Ware told her that he would not marry her unless she signed it, a statement disputed by Mr. Ware. She stated that she did not know anything about the Agreement until ten days before her wedding, by which time she had already purchased her wedding dress and the couple had purchased tickets for a cruise to the U.S. Virgin Islands, where the wedding was to take place. She further contended that, after being presented with the Agreement, she asked Mr. Ware if she should get her own attorney, and he told her that there was no need because Attorney Skeen would represent them both.

Attorney Skeen also testified at the hearing. With regard to Mrs. Ware's lack of independent counsel, Attorney Skeen stated that he could not specifically recall what he had told the parties at the time the Agreement was signed, but that his common practice at that time was to advise parties of their right to seek independent counsel. Nevertheless, he further indicated that he believed he could properly counsel both Mr. and Mrs. Ware in this circumstance, because the parties were not involved in a divorce and, therefore, did not have conflicting interests.

At the conclusion of the hearing, the family court ruled that the Agreement was "void and invalid" because Attorney Skeen had attempted to represent both parties, Mrs. Ware had not had an opportunity to consult with independent counsel, and because the parties had not disclosed to each other the value of their respective assets and debts.

Several months later, following additional proceedings, the family court issued a divorce decree, finding insufficient proof of fault for either party, and granting the divorce based on irreconcilable differences. In dividing the marital assets, the family court awarded Mrs. Ware $200,681.62, which consisted, in large part, of her 50% interest in the Pizza Place. The family court denied Mrs. Ware's requests for spousal support, costs and attorney's fees.

Mr. Ware appealed the family court's ruling that the Agreement was null and void to the Circuit Court of Harrison County, which agreed and reversed that decision, remanding the case for consideration of whether the 51% interest in the Pizza Place acquired during the marriage was controlled by the Agreement. Following another hearing, the family court ruled that, pursuant to the Agreement, Mrs. Ware was not entitled to any interest in the Pizza Place. This time, Mrs. Ware appealed.

On October 10, 2007, the circuit court again reversed the family court, finding that it had abused its discretion in ruling, as a matter of law, that the Agreement controlled the 51% interest that Mr. Ware had acquired in the Pizza Place during the marriage. It again remanded the case to the family court, this time to determine the value of Mrs. Ware's interest in that 51%.

After taking additional expert testimony on the valuation of the 51% interest, the family court awarded Mrs. Ware $92,373.75. Mr. Ware then filed another petition for appeal to the circuit court, and Mrs. Ware filed a cross-petition for appeal. On April 9, 2008, the circuit court entered a final Order affirming the family court's decision. It is from this Order that Mr. Ware now appeals to this Court.

## II.

### STANDARD OF REVIEW

In this case, the Court is asked to review the final order the Circuit Court of Harrison County, West Virginia, affirming the Family Court of Harrison County's final decision.

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law de novo.

Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004). "[Q]uestions about the meaning of contractual provisions are questions of law, and we review a trial court's

answers to them *de novo.*" *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont,* 196 W.Va. 97, 100, 468 S.E.2d 712, 715 (1996). However, "[w]hen a trial court determines that an agreement is ambiguous and construes the meaning of a provision in the contract based on extrinsic evidence, such as the parties' intent, our standard of review is 'clearly erroneous.'" *Jessee v. Aycoth,* 202 W.Va. 215, 218, 503 S.E.2d 528, 531 (1998) (*citing Fraternal Order of Police,* 196 W.Va. at 100, 468·S.E.2d at 715). With these principals in mind, the Court addresses the assignments of error in this case.

## III.

### DISCUSSION

Initially, the Court must consider whether the prenuptial agreement signed by the Wares is valid and enforceable. In her first cross-assignment of error, Mrs. Ware contends that the circuit court erred in reversing the family court's original conclusion that the Agreement is null and void. In its decision, the family court struck down the Agreement on three grounds: (1) one attorney cannot represent two parties with conflicting interests; (2) Mrs. Ware did not have the opportunity to consult with independent counsel; and (3) no disclosure of assets and debts had been made between the parties.

In reversing that decision, the circuit court held that the family court had clearly erred in finding that Mrs. Ware was denied an opportunity to consult with independent counsel. It further concluded that, although Attorney Skeen may have acted inappropriately, his representation of both parties was not sufficient to invalidate the Agreement, absent a showing of coercion or duress. The circuit court further found that, when she signed it, Mrs. Ware understood the Agreement and its impact on her legal rights, as evidenced by her request to remove the waiver of alimony from the Agreement. Consequently, it found that Mrs. Ware's lack of independent counsel was not fatal to the contract. Finally, the circuit court found that Mrs. Ware had sufficient knowledge of Mr. Ware's financial condition prior to entering into the Agreement, despite there being no formal disclosure of assets and debts.

### A. Validity of the Agreement

██ By statute, West Virginia permits couples to enter into agreements establishing certain property rights prior to marriage.

"Antenuptial agreement" or "prenuptial agreement" means an agreement between a man and woman before marriage, but in contemplation and generally in consideration of marriage, by which the property rights and interests of the prospective husband and wife, or both of them, are determined, or where property is secured to either or both of them, to their separate estate, or to their children or other persons. An antenuptial agreement may include provisions that define the respective property rights of the parties during the marriage, or upon the death of either or both of the parties. The agreement may provide for the disposition of marital property upon an annulment of the marriage or a divorce or separation of the parties. A prenuptial agreement is void if at the time it is made either of the parties is a minor.

W. Va.Code § 48–1–203 (2009). Thus, where both parties are of the age of majority, a couple can enter into a prenuptial agreement providing for distribution of property in the event of a divorce.

██ This Court has held that prenuptial agreements are presumptively valid.

Prenuptial agreements that establish property settlements and support obligations at the time of divorce are presumptively valid in West Virginia; the burden of proving the invalidity of such an agreement is upon the person who would have the agreement held invalid.

Syl. Pt. 1, *Gant v. Gant,* 174 W.Va. 740, 329 S.E.2d 106 (1985). To establish that such an agreement is invalid, the party challenging it must prove a problem with its formation:

The validity of a prenuptial agreement is dependent upon its valid procurement, which requires its having been executed voluntarily, with knowledge of its content and legal effect, under circumstances free of fraud, duress, or misrepresentation; however, although advice of independent counsel at the time parties enter into a

prenuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice of counsel is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent adult and both parties have had the *opportunity* to consult with independent counsel.

*Id.* at 742, 329 S.E.2d at 108, Syl. Pt. 2.

■ Mrs. Ware contends that the Agreement is invalid because she entered into it under duress, she had no opportunity to seek independent counsel before signing it, and she and Mr. Ware failed to fully disclose their assets and debts to one another. Because the Court finds that Attorney Skeen inappropriately purported to represent both Mrs. Ware and Mr. Ware in the formation of the Agreement, thereby interfering with Mrs. Ware's opportunity to consult with independent counsel, we hold that the Agreement is invalid.[1]

### 1.

■ This Court has not heretofore required that both parties to a prenuptial agreement obtain the advice of independent counsel. Rather, in *Gant,* this Court stated:

although advice of independent counsel at the time parties enter into a prenuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice of counsel is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent adult and both parties have had the *opportunity* to consult with independent counsel.

174 W.Va. at 742, 329 S.E.2d at 108, Syl. Pt. 2, in part. Thus, a prenuptial agreement is invalid if either party lacked the opportunity to consult with independent counsel.

In this case, Mrs. Ware did not consult with independent counsel before entering into the Agreement. At issue is whether she had such opportunity. Mrs. Ware contends that, after being presented with the Agreement, she asked Mr. Ware if she should retain her own counsel and he told her it was not necessary, because Attorney Skeen was representing them both. Mr. Ware denies that they had such conversation, and instead contends that Attorney Skeen informed Mrs. Ware of her right to obtain independent counsel.

Attorney Skeen cannot remember what was said at the time. The two "Certification of Representation" forms signed by Attorney Skeen and the parties, however, indicates that Attorney Skeen consulted with each party and "fully advised" each of their "property rights and of the legal significance of the foregoing Agreement." Nothing in the Certification indicates that Attorney Skeen advised each party of their right to independent counsel or that he advised Mrs. Ware that he was representing Mr. Ware's interests, rather than her interests. To the contrary, it appears that Attorney Skeen led both parties to believe that he could represent each of their interests sufficiently.[2]

It is well established that one attorney may not represent two parties with conflicting interests without a knowing and voluntary waiver of rights. Rule 1.7(a) of the West Virginia Rules of Professional Conduct provides that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client." Similarly, Rule 1.7(b) provides that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client...." If, however, the attorney reasonably believes that such representation would not adversely affect either client, and if each client consents after consultation, then dual representation is permissible. *Id.*

The "Comment" section of Rule 1.7 of the Rules of Professional Conduct further ex-

---

1. In light of this holding, it is not necessary to address Mrs. Ware's arguments concerning duress and disclosure of assets.

2. In fact, Attorney Skeen's testimony before the family court reflects that he still purports to have represented the interests of each party and that he did not see those interests as "in conflict."

plains that relevant factors to consider in determining whether dual representation may be appropriate include the type of functions being preformed by the attorney and the likelihood that an actual conflict may arise. "For example, a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other, but common representation is permissible where the clients are generally aligned in interest even though there is some difference of interest among them." *Id.*

■■■■■ This Court has previously recognized that, in certain instances, dual representation is never appropriate, even if both parties are willing to consent.

It is improper for a lawyer to represent both the husband and the wife at any stage of the separation and divorce proceeding, even with full disclosure and informed consent. The likelihood of prejudice is so great with dual representation so as to make adequate representation of both spouses impossible, even where the separation is "friendly" and the divorce uncontested. The provisions of W. Va.Code § 48-2-4(a)(10) (1992) [now W. Va.Code § 48-5-201 (2009)], which allow a divorce for irreconcilable differences, do not alter the impropriety of dual representation.

Syl. Pt. 4, *Walden v. Hoke,* 189 W.Va. 222, 429 S.E.2d 504 (1993). Thus, in the context of a divorce, one attorney can never represent both parties.

■■■■■ Like divorce actions, the nature of prenuptial agreements is such that the parties' interests are fundamentally antagonistic to one another. Indeed, the purpose of a prenuptial agreement is to preserve the property of one spouse, thereby preventing the other from obtaining that to which he or she might otherwise be legally entitled. *See McKee–Johnson v. Johnson,* 444 N.W.2d 259, 268 n. 8 (Minn.1989) ("[O]ne of the goals, if not the primary purpose, of an antenuptial agreement is to alter state-prescribed property rights which would otherwise arise on dissolution of marriage.") (*overruled on other grounds by In re Estate of Kinney,* 733 N.W.2d 118 (Minn.2007)). In this circumstance, as in a divorce, "[t]he likelihood of prejudice is so great with dual representation so as to make adequate representation of

both … [parties] impossible…." *Walden,* 189 W.Va. at 223, 429 S.E.2d at 505, Syl. Pt. 4, in part. Accordingly, the Court holds that one attorney may not represent, nor purport to counsel, both parties to a prenuptial agreement.

In the instant case, because Attorney Skeen led Mrs. Ware to believe that he could represent her interests as well as those of Mr. Ware, the Court finds that Mrs. Ware was divested of her opportunity to consult with independent counsel. While the memories of the various individuals present at Attorney Skeen's office for the signing of the Agreement conflict, the Certification of Attorney signed by Mrs. Ware and Attorney Skeen speaks volumes. Specifically, the Certification indicates that Attorney Skeen had "fully advised" Mrs. Ware of her legal rights and of the consequences associated with entering into the Agreement. Such statements would reasonably have led Mrs. Ware to believe that Attorney Skeen was representing her interests and, thus, mislead Mrs. Ware into believing that no independent counsel was necessary. Consequently, the Court finds that the representations made to Mrs. Ware through the Certification of Attorney interfered with her *opportunity* to consult with independent counsel. The Agreement, therefore, was procured in an invalid manner and, thus, is unenforceable. *See Gant,* 174 W.Va. at 742, 329 S.E.2d at 108, Syl. Pt. 2.

2.

Not only does this case highlight the pitfalls of one attorney purporting to represent the interests of both parties in the negotiation and formation of a prenuptial agreement, it reemphasizes the importance of the proposition set forth in *Gant* that the "advice of independent counsel at the time parties enter into a prenuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily." 174 W.Va. at 742, 329 S.E.2d at 108, Syl. Pt. 2, in part. As several other states have recognized, not only does the advice of independent counsel "help" to demonstrate the validity of a prenuptial agreement, it may, in fact, "be the best evidence that a party has entered into an antenuptial agreement voluntarily and knowledge-

ably...." *Randolph v. Randolph,* 937 S.W.2d 815, 822 (Tenn.1996); *see also In re Estate of Smid,* 756 N.W.2d 1, 18 (S.D.2008) ("Presence of independent counsel is the best indicator that the disadvantaged party understood the effect of the agreement.").

Notably, no state has instituted a *per se* rule requiring that parties to a prenuptial agreement must always obtain independent counsel. Many states, however, consider the presence of, or meaningful opportunity to seek, independent legal advice to be a significant factor in determining the validity of such a contract. *See, e.g., In re Estate of Lutz,* 563 N.W.2d 90, 98 (N.D.1997) ("We agree with the view that lack of adequate legal advice to a prospective spouse to obtain independent counsel is a significant factual factor in weighing the voluntariness of a premarital agreement."); *Fletcher v. Fletcher,* 68 Ohio St.3d 464, 628 N.E.2d 1343, 1348 (1994) ("The meaningfulness of the opportunity of the nonproponent party to seek counsel before executing an antenuptial agreement is, therefore, a significant element of the *Gross* test to determine whether coercion or overreaching occurred."); *Holler v. Holler,* 364 S.C. 256, 612 S.E.2d 469, 476 (S.C.Ct. App.2005) ("Whether a party obtained independent legal advice is a significant consideration in evaluating whether an antenuptial agreement was voluntarily and understandingly made.").

Furthermore, although not requiring that both parties to a prenuptial agreement obtain independent counsel, a number of states place the burden of proving the validity of a prenuptial agreement on the party seeking its enforcement. *See, e.g., Dove v. Dove,* 285 Ga. 647, 680 S.E.2d 839, 842 (2009) ("We held that the party seeking enforcement bears the burden of proof to demonstrate that: (1) the antenuptial agreement was not the result of fraud, duress, mistake, misrepresentation, or nondisclosure of material facts; (2) the agreement is not unconscionable; and (3) taking into account all relevant facts and circumstances, including changes beyond the parties' contemplation when the agreement was executed, enforcement of the antenuptial agreement would be neither unfair nor unreasonable."); *Cannon v. Cannon,* 384 Md. 537, 865 A.2d 563, 584 (2005) ("With the existence of a confidential relationship between the parties, the burden of proof correctly falls upon the party seeking to enforce the agreement."); *Randolph,* 937 S.W.2d at 821 (holding that burden of proving existence of valid prenuptial agreement lies with party seeking to rely on contract.). By placing the burden on the party seeking to enforce a prenuptial agreement, courts in these states do not presume that such agreements are valid.

West Virginia certainly has not been alone in affording prenuptial agreements a presumption of validity and assigning the burden of proof to the party seeking to invalidate the agreement. Indeed, states that have adopted the Uniform Premarital Agreement Act have each placed the burden on the party challenging a prenuptial agreement by statute.

▄▄ Nevertheless, in case after case challenging the validity of prenuptial agreements, this Court has considered these same arguments, although this is the first time we have examined the validity of a prenuptial agreement where one attorney purported to represent *both* parties. It has become increasingly clear that the better practice is to transfer the burden of proof where the party challenging a prenuptial agreement was not represented by independent counsel during its formation to the party seeking its enforcement. Such a change in the burden would necessarily undermine the presumption of validity normally afforded such contracts. Thus, not only does the presence of independent counsel help to demonstrate that there "has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily," Syl. Pt. 2, in part, *Gant,* 174 W.Va. at 742, 329 S.E.2d at 108, such counsel is now a prerequisite to obtaining the presumption of validity that typically applies to prenuptial agreements.

▄▄ The Court, therefore, holds that for the presumption of validity to apply to a prenuptial agreement, both parties to that agreement must be represented by independent counsel. Moreover, where one party to a prenuptial agreement is represented by counsel while the other is not, the burden of establishing the validity of that agreement is on the party seeking its enforcement. To the extent that *Gant v. Gant,* 329 S.E.2d 106,

174 W.Va. 740 (1985), and its progeny hold otherwise, they are overruled.

## B. Remaining Issues

Because the Agreement in this case is invalid, there is no need to address Mr. Ware's two assignments of error, in which he contests the circuit court's application of the Agreement to the 51% interest in the Pizza Place acquired during the marriage, and contests its valuation of that interest. The Court remands Mrs. Ware's remaining assignments of error for reconsideration by the circuit court, in light of this decision. The circuit court will necessarily have to address whether Mrs. Ware should receive compensation for any increase in value in the Pizza Place that occurred during the course of the marriage, a question that was not necessary to consider under its prior ruling.

## IV.

## CONCLUSION

For the reasons stated herein, the Court reverses the April 9, 2008, final Order of the Circuit Court of Harrison County, West Virginia, and remands the case for further proceedings consistent with this Opinion.

Reversed and Remanded.