STATE OF WEST VIRGINIA

BEVERLY TRUMAN-GILMORE,
Respondent Below, Petitioner

vs) No. 14-0194 (Kanawha County 10-D-469)

BOYD GILMORE,
Petitioner Below, Respondent

**FILED**

**May 13, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**MEMORANDUM DECISION**

The petitioner, Beverly Truman-Gilmore, by counsel Michael D. Weikle, appeals the January 28, 2014, final order of the Circuit Court of Kanawha County denying her appeal of a December 11, 2013, order of the Family Court of Kanawha County. The family court found a prenuptial agreement entered into by Ms. Truman-Gilmore and the respondent herein, Boyd Gilmore, to be valid and enforceable. Based on the terms of the prenuptial agreement, the family court ordered Ms. Truman-Gilmore to pay Mr. Gilmore the sum of $2,069,000.00, which was comprised of the value placed on a government securities investment account and certain insurance proceeds. In this appeal, Ms. Truman-Gilmore challenges the family court's ruling declaring the prenuptial agreement valid and enforceable. Mr. Gilmore, by counsel Thomas J. Gillooly, maintains that the family court committed no reversible error.

Upon review of the parties' arguments, the appendix record, and the pertinent authorities, we reverse the family court's decision finding the prenuptial agreement valid and remand this case to the family court for further proceedings consistent with this decision. This case does not present a new or significant question of law and, therefore, satisfies the "limited circumstance" requirement of Rule 21(d) of the Rules of Appellate Procedure. As such, it is properly disposed of through this memorandum decision.

The parties were married on August 23, 2004. Prior to their marriage, Mr. Gilmore disclosed to Ms. Truman-Gilmore that he was under a criminal indictment for what he characterized as a domestic dispute with one of his ex-wives[1] and that she had filed a civil

---

[1]Mr. Gilmore was married seven times before he met Ms. Truman-Gilmore.

1

suit against him. Immediately after they were married, the parties traveled to Florida for their honeymoon. According to Ms. Truman-Gilmore, on August 26, 2004, while they were in Florida, Mr. Gilmore took her to a bank and transferred to her his sole ownership of a government securities investment account with a value of approximately $2,000,000.00. Upon returning from their honeymoon, Mr. Gilmore sold his home in Charleston, West Virginia. In addition, he sold two rental properties he owned to a friend. Thereafter, on May 20, 2005, Mr. Gilmore pled guilty pursuant to a plea agreement to the felony offense of burglary by entering without breaking.[2] Subsequently, Mr. Gilmore was sentenced to a indeterminate term of one to fifteen years in prison.[3] Mr. Gilmore was incarcerated sometime in late July 2005; he was released from prison on January 10, 2010. The parties never lived together after Mr. Gilmore went to prison. While Ms. Gilmore initially visited Mr. Gilmore, the parties became estranged sometime in 2009.

On March 15, 2010, Mr. Gilmore filed a petition for divorce from Ms. Truman-Gilmore. The parties had no children together and, therefore, the only issue to be resolved was the division of property. At issue in particular were the funds that were originally in the government securities investment account. By the time of the divorce proceedings, Ms.

---

[2]The appendix record submitted in this case includes a Presentence Report prepared by the Adult Probation Department of Kanawha County, West Virginia, as a result of Mr. Gilmore's guilty plea. The report states that a Kanawha County Grand Jury returned a four-count indictment against Mr. Gilmore in May 2003 charging him with one count each of the following offenses: burglary by breaking and entering; burglary by entering without breaking; domestic battery; and violation of a protective order. It was alleged that on August 26, 2002, Mr. Gilmore used a screwdriver to gain entry through a rear sliding glass door into a home belonging to Kimberly Baire Gilmore, his estranged wife at that time. When the police responded to a hang up call received by Metro 911 from Ms. Baire Gilmore's home that evening, she ran out into her front yard and reported that Mr. Gilmore had entered her residence through a rear door, tackled her, and proceeded to shock her with what was later determined to be a 200,000 volt stun gun. The stun gun was recovered by the police from Ms. Baire Gilmore's home along with a black stocking mask, a Craftsman brand screwdriver, wire ties and a rubber surgical glove. The couple's five children were inside the residence at the time of the incident.

[3]According to Ms. Truman-Gilmore, Mr. Gilmore agreed to plead guilty because he believed that the sentencing court would accept the State's recommendation of home incarceration in lieu of incarceration in a state prison facility.

Truman-Gilmore had transferred a substantial portion of the funds, *i.e.,* $1,175,000.00,[4] into what is referred to in the family court order as the "Cook Islands Trust."[5] Mr. Gilmore asserted that the government securities investment account was his separate property and that he transferred the funds to Ms. Truman-Gilmore to enable her to manage the money during his imprisonment. Conversely, Ms. Truman-Gilmore maintained that Mr. Gilmore had made an unconditional gift of the funds to her.[6]

During the proceedings before the family court, Mr. Gilmore submitted into evidence a document entitled "Ante-Nuptial Agreement" purported to be a prenuptial

---

[4]The family court determined that the government securities investment account had a total value of $2,049,000.00 at the time of the parties' separation. Ms. Truman-Gilmore's financial statement listed her significant assets as the Cook Islands Trust; $50,000.00 in checking accounts; and $247,923.02 in prepaid legal fees. Ms. Truman-Gilmore testified that the legal fees were paid to her attorney, Mr. Weikle, in cash from funds that the Trustee, her nephew, withdrew from the Trust on her behalf. Based on the value of the subject funds at the date of separation and Ms. Truman-Gilmore's financial statement, it was determined that there was a $576,077.00 deficit. During the proceedings below, Ms. Truman-Gilmore testified that she could not account for the missing funds.

[5]The family court order states that:

> The uncontroverted evidence established that [Ms. Truman-Gilmore] created the Trust and funded it with a portion of the Treasury Direct Securities. By its terms, the Trust Agreement subjects the Trust to the "Laws of the Cook Islands pursuant to the International Trust Act of 1984." The Cook Islands are located in the South Pacific. . . .The Trust Agreement explains elsewhere that . . . the Trust assets are protected from court orders issued in other countries[.]

[6]Mr. Gilmore did not claim any ownership of the funds in the government securities investment account when he disclosed his financial status to the Kanawha County Probation Department prior to his sentencing for his burglary conviction. He only reported that his assets had a total value of $70,000.00. He failed to disclose the recent sale of his Charleston home and rental properties for which he received a total of $267,000.00. Moreover, while he was incarcerated, Mr. Gilmore on several occasions filed affidavits in both state and federal courts declaring he was an indigent person in order to obtain waivers of filing fees, transcription costs, court costs, and copying fees. Ultimately, he requested and received appointment of counsel to represent him based on his alleged indigent status.

agreement executed by the parties on August 10, 2004. In the agreement, the parties essentially waived all claims of any sort against each other arising out of their marriage. Mr. Gilmore argued that the prenuptial agreement barred any claim by Ms. Truman-Gilmore to the funds that had been formerly held in the government securities investment account.[7] Ms. Truman-Gilmore contested the genuineness of the prenuptial agreement, contending first that the notary's signature had been forged and later, that her own signature was forged as well. Mr. Gilmore then presented expert testimony from a document examiner who opined that the signatures of both the notary and Ms. Truman-Gilmore were not forged based upon a comparison of their signatures on the prenuptial agreement with their signatures on unrelated sample documents. Based on this testimony, and finding no evidence of coercion, undue influence, disability or lack of education on the part of Ms. Truman-Gilmore, the family court found that the prenuptial agreement was valid and enforceable. The court further found that the money formerly held in the government securities investment account was Mr. Gilmore's separate property pursuant to the prenuptial agreement and was simply put under Ms. Truman-Gilmore's control as a matter of convenience to enable her to manage the funds, at his direction, during his incarceration. Determining that the funds had a total value of $2,049,000 at the time of separation and that Ms. Truman-Gilmore owed Mr. Gilmore an additional $20,000.00 based on her own testimony acknowledging that she had deposited an insurance proceeds check[8] that belonged to him into her checking account, the family court ordered Ms. Truman-Gilmore to pay Mr. Gilmore the sum of $2,069,000.00. As noted above, Ms. Truman-Gilmore appealed this decision to the Circuit Court of Kanawha County. Following the circuit court's denial of the appeal, she sought relief in this Court.

Our standard of review for matters arising in divorce cases was set forth in the syllabus of *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004), as follows:

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

---

[7]The prenuptial agreement states, in pertinent part: "Any assets or investments of any kind that might be held by the other spouse for any reason must be returned to the other spouse or heirs."

[8]It appears that the insurance proceeds resulted from a claim Mr. Gilmore filed after a fire occurred at one of his rental properties.

4

In this appeal, Ms. Truman-Gilmore challenges the validity of the prenuptial agreement based upon its content and the circumstances surrounding its execution. With regard to prenuptial agreements, we have held that "[t]he validity of a prenuptial agreement is dependent upon its valid procurement, which requires its having been executed voluntarily, with knowledge of its content and legal effect, under circumstances free of fraud, duress, or misrepresentation[.]" Syl. Pt. 2, in part, *Gant v. Gant*, 174 W.Va. 740, 329 S.E.2d 106 (1985), *overruled on other grounds by Ware v. Ware*, 224 W.Va. 599, 687 S.E.2d 382 (2009). More recently, we explained that "[w]hile the terms of a postnuptial agreement need not achieve a fair or equal division of the parties' assets and liabilities, it is imperative that the parties to such an agreement fully disclose the nature and the value of their property that is the subject of the postnuptial agreement." *Morris v. Morris*, No. 13-0742, 2014 WL 1272517, at *5 n.10 (W.Va. March 28, 2014) (memorandum decision).

Upon review, we find that the prenuptial agreement fails to disclose the nature and value of the assets that are purported to be subject to its provisions. While a "Treasury Direct Account" is listed as property owned by Mr. Gilmore, no value is given for this asset. The same is true with regard to all assets that are listed in the agreement as belonging to Mr. Gilmore. As for assets belonging to Ms. Truman-Gilmore, the prenuptial agreement indicates that the only property she owned at the time the document was executed was a "Ford Escort 1995" even though evidence in the record indicates the parties resided in a home owned by Ms. Truman-Gilmore after they married. In *Morris*, we found the circuit court erred by reversing the family court's decision that invalidated the parties' postnuptial agreement "based upon misrepresentations of the character and value of the parties' property at the time the parties entered into said agreement." *Morris*, 2014 WL 1272517, at *1. We explained that

> the parties' prenuptial agreement [was] not valid as a means of distributing the parties' property in their divorce action because it misrepresented the character and the value of the parties' property that was purportedly subject to the agreement and failed to include all of the parties' assets and liabilities within its terms . . . the subject postnuptial agreement reveals that it is fraught with glaring omissions and gross inaccuracies.

*Id.* at *4. We reach the same conclusion in this case. Not only were the value of the assets listed as being subject to the prenuptial agreement not disclosed, certain assets like Ms. Truman-Gilmore's home were omitted from the document. Furthermore, while the prenuptial agreement states that the parties shall be liable for their own premarital debts, there is no indication of what those debts were as they were not set forth in the document either.

5

While the family court considered most of the factors that are determinative of the validity of a prenuptial agreement, the fact that the subject agreement failed to disclose the nature and value of the parties' assets and liabilities was either overlooked or simply disregarded. As explained above, fully disclosing the nature and value of the property subject to such an agreement is essential to finding the document is valid and free of misrepresentation. Consequently, based on all the above, we conclude that the family court erred by declaring the prenuptial agreement valid and enforceable.[9] Therefore, the final order of the Circuit Court of Kanawha County entered on January 28, 2014, denying Ms. Truman-Gilmore's appeal of the December 11, 2013, order of the family court is reversed. Because we have found the prenuptial agreement to be unenforceable, it can no longer serve as a basis to distribute the parties' property. Accordingly, this case is remanded to the family court for further proceedings to determine the proper distribution of the parties' property.

Reversed and remanded.

**ISSUED:** May 13, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Allen H. Loughry II

**CONCURRING AND WRITING SEPARATELY:**

Justice Brent D. Benjamin

---

[9]Having found the prenuptial agreement invalid based upon the misrepresentations contained therein, we need not address Ms. Truman-Gilmore's other assignments of error.

BENJAMIN, Justice, concurring:

I agree with the majority's resolution of the case.  I write separately on the matter of Boyd Gilmore's repeated execution of sworn pauper's affidavits to avoid having to pay filing fees and costs, during a period of time when he was purported to have over $2,000,000.00.  Mr. Gilmore's use of these affidavits of indigency at the same time he claims to own this amount of money appears to be fraudulent, and should be referred to the county prosecuting attorney's office.