IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2024 Term

_____

No. 23-ICA-242

_____

FILED

June 11, 2024

released at 3:00 p.m.
ASHLEY N. DEEM, DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

DENNY HARTON,
Respondent Below, Petitioner

v.

TERRI HARTON,
Petitioner Below, Respondent

_____

Appeal from the Family Court of Wood County
The Honorable Ellen L. Smith, Judge
Civil Action No. FC-54-2020-D-70

REVERSED AND REMANDED

_____

Submitted: February 7, 2024
Filed: June 11, 2024

Mark W. Kelley, Esq.                     Katharine L. Davitian, Esq.
Ray, Winton & Kelley, PLLC               Davitian & Davitian
Charleston, West Virginia                Parkersburg, West Virginia
Counsel for Petitioner                   Counsel for Respondent

JUDGE LORENSEN delivered the Opinion of the Court.

LORENSEN, JUDGE:

Petitioner Denny Harton ("Husband") appeals the Family Court of Wood County's May 10, 2023, Final Order Regarding the Validity of Premarital Agreement in favor of Terri Harton ("Wife"). The family court held that the parties' June 17, 2000, premarital agreement (the "Agreement") was invalid and unenforceable. After careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we disagree with the family court and therefore reverse its order.

## I.    FACTUAL AND PROCEDURAL HISTORY

Husband and Wife were married on June 17, 2000. Husband had primary custody of his two children from a prior marriage, and Wife had primary custody of her two children from a prior relationship. At the time of their marriage, Wife was 34 years old and a recent graduate of West Liberty College (now University). Husband at that time was 41 years old and an experienced businessman. Wife and her children moved into Husband's Wood County home at the inception of the marriage.

Prior to their marriage, Husband expressed to Wife a desire to enter into a prenuptial agreement. Husband downloaded a form prenuptial agreement document he located on the internet which ultimately, after revision, became the Agreement. Neither party was represented by legal counsel in connection with drafting the Agreement. Several facts surrounding the execution of the Agreement are contested. Both Husband and Wife reviewed a draft document together, although precisely when they reviewed the document

1

is in dispute. Husband claims they reviewed the draft several months before the wedding, while Wife claims they reviewed it two or three weeks before the wedding. According to Wife, she did not understand the draft document she reviewed but she did not seek legal counsel or otherwise undertake further inquiry about what she did not understand. Nevertheless, Wife testified that she understood that a significant and primary purpose of the Agreement was to protect Husband's assets he owned prior to their intended marriage in the case of a subsequent divorce. After initial review, changes were made to the draft document to add a provision concerning their children.[1]

According to Wife, the next time she dealt with the Agreement was on their wedding day when husband presented the Agreement in a sealed envelope and asked Wife to go to a bank alone[2] for signature before a Notary Public. Wife also believed the Agreement that she signed looked longer than the document they previously reviewed,[3] but she did not read the Agreement that she signed.[4] The Agreement reflects that it was signed

---

[1] Husband claims Wife requested changes addressing their children, while Wife testified that it was Husband who wanted the changes.

[2] Husband testified that they went together to the bank and signed the Agreement simultaneously.

[3] Wife states the first document was approximately two or three pages long and on Husband's company letterhead. Husband strongly disputes this version of events and testified that there was never a document on company letterhead and the Agreement was the same as the earlier draft document with only the provision about children added.

[4] The family court found Wife's account surrounding the execution of the Agreement to be more compelling than that of Husband. The court found that Wife's "testimony that she did not read this second agreement because she read the first agreement

2

by both parties on the same date with signatures notarized by the same notary. Exhibits to the Agreement, also signed by both parties, reflect financial disclosures of the parties' premarital assets and liabilities. At no time was legal counsel involved with either party in drafting, evaluating, or advising either party concerning procurement of the Agreement.

The substantive provisions of the Agreement contain six printed pages with thirteen numbered paragraphs followed by signature and notary pages and attached separately signed financial disclosure exhibits, for a total of twelve pages. Specifically relevant to this case are the following provisions in the Agreement:

> 1. SEPARATE PROPERTY. Except as otherwise provided in this Agreement, the following property owned or subsequently acquired by either party shall remain and be their separate property:
> - All property, including real or personal property, the income from such property, and the investments and re-investments of such property.
> - All property acquired by either party by gift, devise, bequest or inheritance.
>
> The property currently owned by each party is described in Exhibit A and Exhibit B to this Agreement, which by this reference are incorporated into this Agreement. Such separate property of each party shall be subject entirely to their own individual use, control, benefit and disposition. Neither of the parties shall before or after the contemplated marriage acquire for themselves individually, assigns or creditors, any interest in the separate property of the other party nor any right to the use, control, benefit or disposition of such property.

---

and did not understood [sic] it, that there really was no point in re-reading what she thought was the same agreement, with a minor modification relating to her children, is reasonable and credible."

a. Waiver. Additionally, both parties waive, release and relinquish any ownership or right in the separate property of the other and to use, control, benefit or dispose of the other's separate property….

\* \* \*

8. DISSOLUTION OF MARRIAGE. Both parties to this Agreement understand that the Uniform Premarital Agreement Act and court decisions provide for consideration by the Court of a premarital agreement if a marriage is dissolved. The parties to this Agreement understand that some courts have disregarded provisions in a premarital agreement that provide for disposition of property in the event of a dissolution. Without, in any way, anticipating a dissolution or planning for a dissolution, but recognizing the realities of the world, it is the express intention of [Husband] and [Wife] that this provision shall remain in full force and effect in the event of a dissolution:

a. Each party shall have an equal interest in the property acquired by the parties during the course of the marriage (and which is not merely the result of increase in value of any of the property owned by the parties prior to the marriage, as listed on the attached schedules of property.)

b. [Wife] shall have a proportionate interest in the increase in value during the marriage of the homestead real estate, proportionate to the percentage contribution of the household expenses, if any, and child care/household duties performed by [Wife] during the course of the marriage.

c. All savings, investments, retirement accounts, and property listed on the attached schedules as property owned by a party prior to the marriage shall remain the property of the person who brought such property into the marriage. Any appreciation, income or other increase to such property shall remain the property of the person who brought such property into the marriage….

9. SUPPORT. Each of the parties has income from property interest sufficient to provide for his or her respective support. Each has been self-supporting for a period of time prior to the

4

contemplated marriage. Both parties feel that they are capable of future self-support and of maintaining themselves on a self-supporting basis. Therefore, in the event of a marital separation or dissolution of marriage, it is agreed and understood that neither party shall seek or obtain any form of alimony or support from the other, or seek any relief other than a distribution of their joint property interests or those property interests acquired during the course of their marriage, in any manner other than as provided by this Agreement.

Wife filed a divorce petition in February 2020. In Husband's answer and counter-petition, Husband sought enforcement of the Agreement. The family court held an extensive evidentiary hearing solely on the issue of the legal validity of the Agreement. After the hearing and the parties' submission of dueling proposed orders, the family court adopted the proposed order drafted by Wife's counsel with very few changes. The family court's order found that the Agreement's provisions addressing how property will be distributed upon divorce (Paragraph 8) and the provision about spousal support (Paragraph 9) were "relatively straightforward." However, the family court's order found it to be "inconceivable to charge [Wife] with knowledge of the contents of the [Agreement] and the legal effect of those contents when the [A]greement itself does not clearly define the parties' rights or accurately state the marital rights the parties are waiving…."[5] Additionally, the family court found that Wife had some opportunity to consult with a lawyer, but that the opportunity was "not reasonable under the circumstances."

---

[5] The family court noted that the term "marital property" is not found in the agreement, that the agreement confuses terms joint property and marital property, and that the agreement failed to address marital debt.

5

The family court made the following conclusions in its order:

1. There is no legal presumption that the [Agreement] is valid and enforceable given that the parties did not have legal counsel.
2. [Husband] procured the [Agreement] from [Wife] under circumstances of duress.
3. [Wife] did not have an understanding of the content and legal effect of the [Agreement]. [Husband] did not have an understanding of the content or terms used in the [Agreement].
4. The content and legal effect of the [Agreement] would not be understandable to an adult of reasonable intelligence.
5. As in *Owen*, the [Agreement] fails to provide a specific explanation of the rights [Wife] is waiving, especially those associated with property acquired during the course of the marriage that would be deemed marital property, subject to equitable distribution.
6. The [Agreement] is invalid and unenforceable.

It is from this order that Husband appeals.

## II.   STANDARD OF REVIEW

In appeals from family court proceedings, our standard of review is as follows:

> In reviewing . . . a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*. Syl. Pt., [in part,] *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

*Amanda C. v. Christopher P.*, 248 W. Va. 130, 133, 887 S.E.2d 255, 258 (Ct. App. 2022); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate court review of family court order).

6

## III. DISCUSSION

### A. Jurisdiction

This Court, as a court of limited jurisdiction, has a "responsibility *sua sponte* to examine the basis of [our] own jurisdiction." *James M.B. v. Carolyn M.*, 193 W. Va. 289, 292, 456 S.E.2d 16, 19 (1995). The West Virginia Appellate Reorganization Act vests this Court with jurisdiction over most[6] final judgments or orders of a family court. *See* W. Va. Code § 51-11-4(b)(2) (2022).[7] The Supreme Court of Appeals of West Virginia has held that "[t]he usual prerequisite for our appellate jurisdiction is a final judgment, final in respect that it ends the case." *Coleman v. Sopher*, 194 W. Va. 90, 94, 459 S.E.2d 367, 371 (1995) (citation omitted). The requirement of finality is "mandatory and jurisdictional." *James M.B.,* 193 W. Va. at 292, 456 S.E.2d at 19. The "'rule of finality' is designed to prohibit 'piecemeal appellate review of trial court decisions which do not terminate the litigation[.]'" *National Union Fire Insurance Company of Pittsburgh, PA v. Westlake Chemical Corp.*, 900 S.E.2d 1, 6 (W. Va. 2024) (citations omitted). Generally, "[a] case is final only when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined." *Id.* at 7.

---

[6] We have no jurisdiction concerning final family court orders in any domestic violence proceeding.

[7] Interlocutory appeals are expressly excluded from our jurisdiction except in narrow circumstances involving certain temporary family court orders concerning child custody. *See* W. Va. Code § 51-11-4(d)(8) (2021) *and* W. Va. Code § 48-9-203(f) (2022).

In the instant case, the family court plainly labeled the order as a "final order" and included language notifying both parties of the family court appeal rights under Rule 22 of the *West Virginia Rules of Practice and Procedure for Family Court*. The parties appear to agree that the family court's order is final in nature and effect as to the issue of the validity and enforceability of the Agreement. However, the family court's order does not terminate the litigation on its merits as it does not dispose of issues concerning division of the parties' property or spousal support.[8] While there is no published West Virginia opinion designating a family court's order solely resolving the validity and enforceability of a prenuptial agreement as an appealable final order, the Supreme Court of Appeals of West Virginia in a 2017 memorandum decision found an otherwise interlocutory order regarding a limited *postnuptial* agreement to be a "final order." *Amber J. v. Shannon J.*, 2017 WL 2229978, at * 4 (W. Va. May 22, 2017) (memorandum decision). Recognizing that this memorandum decision is legal precedent (though of lesser weight than a published opinion) at least in the domestic law context, we find that the family court's May 10, 2023,

---

[8] Moreover, our review of the issues in this appeal would be enhanced if the matter had proceeded to conclusion, minimizing appellate interference and limiting our role to one of review rather than one of intervention. Furthermore, a fully developed record and complete decision (rather than a piecemeal, facial challenge to the Agreement) would enable our consideration of the parties' adherence to (or disregard of) the provisions of the Agreement during their marriage, our consideration of the full context of property (and debt) and support-related facts considering the applicability (or inapplicability) of the Agreement, and enable us to go beyond this facial challenge to a short document the parties signed (and to which they presumably agreed to be bound). For example, we are forced to speculate about how Paragraphs 1 and 8 of the Agreement would alter the ultimate equitable distribution of property and to what extent, absent the Agreement, increased (or decreased) value of separate property owned and disclosed by Husband prior to the marriage increased (or decreased) in value during the marriage as a result of Husband's active efforts. *See, e.g.*, *Mayhew v. Mayhew*, 205 W. Va. 490, 519 S.E.2d 188 (1999).

8

Final Order Regarding the Validity of Premarital Agreement constitutes a sufficient final order of the family court in this matter and is not an interlocutory appeal beyond this Court's jurisdiction. *See* W. Va. Code § 51-11-4(d)(8).

### B. Validity and Enforceability of the Agreement

Having disposed of this jurisdictional issue, we now consider Husband's assignments of error. Husband specifies three assignments of error. One of Husband's assignments of error—that the family court erred when it found the Agreement was signed under duress—is now conceded in Wife's response brief to this Court. Accordingly, we will not further address this assignment of error and will proceed with the understanding that the parties agree that the Agreement was *not* signed under duress despite the family court's contrary holding.

Two assignments of error remain. First, Husband argues that the family court erred in finding that Wife did not understand the content and legal effect of the Agreement when Wife testified that she understood that the purpose of the Agreement was to protect Husband's premarital assets and that she did not read the Agreement prior to signing it. Second, Husband argues that the family court erred in finding that the content and legal effect of the Agreement would not be understandable to an adult of reasonable intelligence. After briefly discussing relevant West Virginia authority pertaining to the Agreement, we will address these issues in turn.

At the time Husband and Wife were married in 2000, prenuptial agreements were specifically recognized by statute. W. Va. Code § 48-2-1(b) (1984), *repealed and replaced by* W. Va. Code § 48-1-203 (2001). Then, the only statutory grounds for voiding a prenuptial agreement were that, upon execution, the female party to the agreement was pregnant or either party was a minor.[9] Also, by that time, the Supreme Court of Appeals of West Virginia had decided *Gant v. Gant*, 174 W.Va. 740, 329 S.E.2d 106 (1985), *overruled in part by Ware v. Ware,* 224 W. Va. 599, 687 S.E.2d 382 (2009). In 1985, *Gant* established the following syllabus points:

> 1. Prenuptial agreements that establish property settlements and support obligations at the time of divorce are presumptively valid in West Virginia; the burden of proving the invalidity of such an agreement is upon the person who would have the agreement held invalid.
>
> 2. The validity of a prenuptial agreement is dependent upon its valid procurement, which requires its having been executed voluntarily, with knowledge of its content and legal effect, under circumstances free of fraud, duress, or misrepresentation; however, although advice of independent counsel at the time parties enter into a prenuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice of counsel is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent

---

[9] The successor to the 1984 statute eliminated pregnancy of the female party to the prenuptial agreement at time of signing as a statutory ground to invalidate the agreement. *See* W. Va. Code § 48-1-203 (2001). In 2023, the Legislature adopted the Uniform Premarital Agreement Act which now governs the validity and enforceability of prenuptial agreements in West Virginia for agreements executed on or after July 1, 2023. W. Va. Code § 48-1A-1001(b) (2023). Accordingly, the West Virginia Uniform Premarital Agreement Act does not apply here, as the parties signed the Agreement twenty-three years earlier.

10

> adult and both parties have had the *opportunity* to consult with independent counsel.

Syl. Pts. 1 & 2, *Gant v. Gant*, 174 W. Va. 740, 329 S.E.2d 106 (emphasis in original).

Twenty-four years after *Gant* was decided (and nine-and-a-half years after Husband and Wife signed the Agreement), the Supreme Court of Appeals of West Virginia overruled Syllabus Point 1 in *Gant* presuming a prenuptial agreement's validity.[10] In 2009, the Court established the following new syllabus point:

> For the presumption of validity to apply to a prenuptial agreement, both parties to that agreement must be represented by independent counsel. Moreover, where one party . . . is represented by counsel while the other is not, the burden of establishing the validity of that agreement is on the party seeking its enforcement. To the extent that *Gant v. Gant*, 174 W. Va. 740, 329 S.E.2d 106 (1985), and its progeny hold otherwise, they are overruled.

Syl. Pt 5, *Ware v. Ware*, 224 W. Va. 599, 687 S.E.2d 382. The major focus in *Ware* concerned the role of legal counsel representing or purporting to represent one or more parties in connection with the procurement of a prenuptial agreement. *Id.* at Syl. Pt. 4.

---

[10] When the Agreement was signed, the settled law in West Virginia was clear: prenuptial agreements were presumptively valid. A party seeking to avoid enforcement of a prenuptial agreement bore the burden of invalidating it. We are aware of no challenges to the retroactive application of the *Ware* rule concerning presumptive validity of prenuptial agreements but note that, while a judicial holding overruling settled law is presumed to be retroactive (subject to several exceptions that might be applicable here), a legislative enactment is normally afforded prospective-only application. *Compare Caperton v. A.T. Massey*, 225 W. Va. 128, 690 S.E.2d 322 (2009), *and Bradley v. Appalachian Power Co.,* 163 W. Va. 332, 256 S.E.2d 879 (1979), with W. Va. Code § 2-2-10(b)(6).

Courts, in evaluating the validity of prenuptial agreements after 2009, have applied *Ware*

in scenarios where lawyers were involved in the drafting and review of these documents.

*See Teed v. Teed*, 2013 WL 2149857 (W. Va. May 17, 2013) (memorandum decision)

(prenuptial agreement valid where both parties have independent counsel even though wife

did not understand details); *Owen v. Owen,* 233 W. Va. 521, 759 S.E.2d 468 (per curiam)

(prenuptial agreement invalid where one party's counsel drafted and other party not

represented); *and Gochenour v. Gochenour*, 2023 WL 152171 (W. Va. Ct. App. January

10, 2023) (memorandum decision) (same). Other than limiting *Gant's* presumption of

validity where separate independent counsel are present, *Ware* does not directly deal with

a scenario where, as here, neither party is represented by counsel in connection with the

procurement of the Agreement.[11] Moreover, *Ware* does not create a presumption of

*invalidity* (especially where both parties are self-represented).


Accordingly, operating without the presumption and burden addressed in

*Ware*, we focus on Syllabus Point 2 of *Gant* (which survives *Ware*) to determine whether

the Agreement was validly procured in connection with this facial challenge to the

Agreement. To be valid, *Gant* requires a prenuptial agreement to have been "executed

---

[11] *Lee v. Lee*, 228 W. Va. 483, 721 S.E.2d 53 (2011) (per curiam) is the first prenuptial agreement case published after *Ware*. In that case, husband and wife executed an internet downloaded form prenuptial agreement without the involvement of counsel. The lower court and Supreme Court of Appeals of West Virginia, reflecting general freedom to contract principles, did not invalidate the document, but instead applied contract law standards to deal with any ambiguities in the prenuptial agreement in the overall context of a divorce action.

voluntarily, with knowledge of its content and legal effect, under circumstances free of fraud, duress, or misrepresentation." Syl. Pt. 2, in part, *Gant v. Gant*, 174 W. Va. 740, 329 S.E.2d 106. The parties disagree about several specific events preceding the execution (procurement) of the Agreement. However, several facts are clear. Wife voluntarily signed the Agreement. There is now no dispute that the circumstances were free of fraud, duress, or misrepresentation. Accordingly, the remaining "valid procurement" issue concerns Wife's knowledge of the content and legal effect of the Agreement.

Husband argues that the family court erred in its conclusion that the procurement of the Agreement was invalid because Wife did not understand the content and legal effect of the Agreement. Husband's argument concerning Wife's subjective understanding of the Agreement before its execution is two-fold. Husband argues that Wife in fact had a sufficient understanding of the content and legal effect of the Agreement as reflected by her testimony, and to the extent her understanding of the content and legal effect of the Agreement was insufficient, Wife should not now benefit by asserting that she did not understand the words in a document she voluntarily chose not to read before signing.

In terms of Wife's understanding of the content and legal effect of the Agreement, Husband points to Wife's testimony of her knowledge that Husband had been previously married and harbored bitterness about it. Wife had knowledge of Husband's

13

desire to have her execute the Agreement before they were married, and she understood that Husband wanted to protect his premarital assets, including his business interests, from claims by Wife in the event of divorce. Additionally, Wife separately signed Husband's disclosure of financial information listing premarital assets, including closely held business interests indicating at least a clear opportunity to review this disclosure. Wife testified that, while she reviewed an earlier draft of the document (that was to be amended amicably to address a party's request) weeks before the wedding, she did not understand the draft and did not undertake to seek or engage independent legal counsel for advice or any further inquiry about it despite her awareness of the Agreement's importance to Husband. There is no evidence that Husband did anything to prevent Wife from having the document reviewed or consulting with legal counsel. A thirty-four-year-old college graduate, Wife admitted that she did not read the Agreement she signed on the morning of her wedding, conceding on the record "I never looked at it. I know it's stupid, but I never looked at it."

It is well-settled law in West Virginia that, in all other contexts, "in the absence of extraordinary circumstances, the failure to read a contract before signing it does not excuse a person from being bound by its terms." *Reddy v. Cmty. Health Found. of Man*, 171 W. Va. 368, 373, 298 S.E.2d 906, 910 (1982). Further, "[a] court can assume that a party to a contract has read and assented to its terms, and absent fraud, misrepresentation, duress, or the like, the court can assume that the parties intended to enforce the contract as drafted." *New v. GameStop, Inc.*, 232 W. Va. 564, 578, 753 S.E.2d 62, 76 (2013) (citation

14

omitted). In light of West Virginia law pertaining to the enforceability of unread contracts and Wife's basic understanding of the purpose and effect of the Agreement reflected in the record, we believe that the family court's finding that Wife "did not understand the content and legal effect" of the Agreement cannot alone invalidate the Agreement, and to hold otherwise would be an abuse of discretion in applying the law to the facts.

The valid procurement inquiry of *Gant* goes further: "although advice of independent counsel at the time parties enter into a prenuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice of counsel is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent adult and both parties have had the *opportunity* to consult with independent counsel." Syl. Pt. 2, in part, *Gant v. Gant*, 174 W. Va. 740, 329 S.E.2d 106 (emphasis in original). Accordingly, we now examine the other finding and conclusion of the family court raised as a separate assignment of error by Husband. The family court found that the content and legal effect of the Agreement would "not be understandable to an adult of reasonable intelligence."

In its order, the family court reviewed and made specific findings about the substantive provisions in the Agreement expressly dealing with post-divorce property distribution, Paragraph 8, and spousal support, Paragraph 9, matters that are the primary

15

substantive provisions in the Agreement Husband would seek to apply to the facts in the parties' divorce. The operative part of Paragraph 8 presumably relevant to this facial challenge to the Agreement follows:

> a. Each party shall have an equal interest in the property acquired by the parties during the course of the marriage (and which is not merely the result of increase in value of any of the property owned by the parties prior to the marriage, as listed on the attached schedules of property.)
>
> b. [Wife] shall have a proportionate interest in the increase in value during the marriage of the homestead real estate, proportionate to the percentage contribution of the household expenses, if any, and child care/household duties performed by [Wife] during the course of the marriage.
>
> c. All savings, investments, retirement accounts, and property listed on the attached schedules as property owned by a party prior to the marriage shall remain the property of the person who brought such property into the marriage. Any appreciation, income or other increase to such property shall remain the property of the person who brought such property into the marriage….

The family court expressly determined that the language in Paragraph 8 "appears relatively straightforward." We agree with the family court in this regard. The family court also found that Paragraph 9, concerning spousal support, was "straightforward." These provisions—which constitute the core of any prenuptial agreement—are straightforward and would be understandable to a reasonably intelligent adult. These provisions are also on their face not overbearing or unconscionable.

16

Despite finding the key operative provisions of the Agreement to be straightforward, the family court's order finds fault with the Agreement as drafted.[12] For instance, the family court stated that a reasonable person would not understand she would be "waiving all claims to marital property in the event of divorce." This is a misreading of Paragraph 8 of the Agreement and its application to property acquired during the marriage. Paragraph 8 largely effectuates Husband's desire to shield pre-marriage assets (including a closely held business) and limit awards concerning his home into which Wife was moving. Wife testified that she understood this. By executing the Agreement, Wife did *not* waive claims to property acquired during the marriage, and Paragraph 8 does not appear on its face to conflict with equitable distribution principles in the context of property acquired during the marriage, so there is simply no waiver of all claims in the plain text of the Agreement.

The family court found that "[i]t is inconceivable to charge [Wife] with knowledge of the contents of the [Agreement] and the legal effect of those contents when the [Agreement] does not clearly define the parties' rights or accurately state the marital rights the parties are waiving…." However, from our review on appeal of this facial challenge to the Agreement, we find the Agreement to be written in plain English and

---

[12] The family court finds fault in the Agreement's imprecise legal terminology (*e.g.*, use of the phrase "joint property" but not "marital property") preferring more precise language tracking Chapter 48 of the West Virginia Code. These failings do not render the document unintelligible. Nor do failures of the Agreement to address all potential issues (*e.g.*, marital debts) render the Agreement deficient. If the Agreement is underinclusive, general domestic relations law will apply.

generally understandable to a person of reasonable intelligence. There was, at the time the Agreement was drafted, and there is now no requirement that the text of a prenuptial agreement must identify and explain all existing marital rights or all rights that may be altered by executing a prenuptial agreement. Surely such a document would not be simple, short, and understandable to reasonably intelligent people contemplating marriage later in life arranging their affairs without consulting legal counsel. Accordingly, we find that the family court's conclusion to the contrary is reversible error.

## IV.     CONCLUSION

For the foregoing reasons, we find that that the family court erred by invalidating the Agreement under the limited facts of this case. Accordingly, we reverse the May 10, 2023, Final Order Regarding the Validity of Premarital Agreement and remand this case for further proceedings.

Reversed and Remanded.

18