******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## O. A. *v.* J. A.*
(SC 20590)

D'Auria, Mullins, Kahn, Ecker and Keller, Js.

*Syllabus*

The plaintiff sought to dissolve her marriage to the defendant. Thereafter, the defendant filed a cross complaint in which he sought enforcement of a postnuptial agreement that the parties had executed, which set forth terms for the distribution of property and for determining support awards in the event of the dissolution of the parties' marriage. The plaintiff subsequently filed motions for pendente lite alimony, attorney's fees, and expert fees. The trial court, relying on this court's decision in *Fitzgerald* v. *Fitzgerald* (169 Conn. 147), concluded that it was not required to determine, prior to deciding the plaintiff's motions, whether the parties' postnuptial agreement was enforceable and deferred its decision on that issue until the end of trial. The court, after considering each party's financial resources and the fact that the plaintiff was completely reliant on the defendant for financial support during the marriage, ordered the defendant to pay the plaintiff pendente lite alimony, attorney's fees, and expert fees. The defendant appealed from the trial court's orders, claiming that the trial court incorrectly had determined that it did not need to consider the enforceability of the parties' postnuptial agreement prior to awarding the plaintiff pendente lite alimony and litigation expenses. *Held* that the trial court properly relied on *Fitzgerald* and acted within its discretion in deferring its decision on the enforceability of the parties' postnuptial agreement until the end of trial, and, accordingly, this court affirmed the trial court's orders: the trial court's broad equitable powers and discretion in deciding matters arising in a dissolution action include the discretion to defer a decision on the enforceability of a marital agreement until the parties have had a full and fair opportunity to litigate all issues in the case at a trial on the merits; moreover, contrary to the defendant's contention that *Fitzgerald* was distinguishable from the present case because it involved a separation agreement rather that a postnuptial agreement, the underlying principle in *Fitzgerald*, that the validity of a marital agreement may be assessed when the case is tried on its merits, applies equally to all marital agreements, including prenuptial, postnuptial and separation agreements, and there was no merit to the defendant's assertion that this court had indicated in *Bedrick* v. *Bedrick* (300 Conn. 691) that reliance on *Fitzgerald* in the context of postnuptial agreements is misplaced; furthermore, although this court was not unsympathetic to the defendant's argument that the holding in this case could work an injustice because the plaintiff would not have the means to make the defendant whole if the trial court ultimately determined, after a trial, that the parties' postnuptial agreement is enforceable and that it precludes an award of pendente lite alimony and litigation expenses, the defendant was not without a remedy in such circumstances, as the trial court could ultimately adjust any final financial orders to compensate the defendant for pendente lite payments that previously had been made in contravention of the agreement.

Argued September 17, 2021—officially released January 27, 2022**

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant filed a cross complaint; thereafter, the court, *McLaughlin, J.*, issued certain orders awarding the plaintiff pendente lite alimony, attorney's fees, and expert fees, from which the defendant appealed. *Affirmed.*

*James P. Sexton*, with whom were *Thomas D. Colin*,

*Julia K. Conlin* and, on the brief, *Emily Graner Sexton,* for the appellant (defendant).

*Kenneth J. Bartschi,* with whom was *Karen L. Dowd,* for the appellee (plaintiff).

*Opinion*

KELLER, J. In this interlocutory appeal,[1] we must decide whether a spouse seeking pendente lite alimony, attorney's fees, and expert fees during the pendency of a dissolution action must demonstrate that a postnuptial agreement that purportedly precludes such payments is invalid or otherwise unenforceable before the trial court properly may order the other spouse to make any such payments.

Shortly after their marriage in 2013, the plaintiff, O. A., and the defendant, J. A., executed a postnuptial agreement setting forth terms for the distribution of property and determining support awards in the event of the dissolution of their marriage. In 2019, the plaintiff brought this action, seeking, inter alia, dissolution of the marriage and temporary and permanent alimony. The defendant filed a cross complaint in which he sought, inter alia, enforcement of the parties' postnuptial agreement. Thereafter, the plaintiff filed motions for pendente lite attorney's fees, alimony, and expert fees. After an evidentiary hearing, the trial court granted in part the plaintiff's motions and ordered the defendant to pay the plaintiff (1) temporary alimony in the amount of $20,000 per month, (2) $114,019.99 in current attorney's fees and a retainer for legal counsel in the amount of $250,000, and (3) a contribution toward specified future expert fees in the amount of $25,000. On appeal, the defendant claims that the trial court incorrectly determined that it need not determine the enforceability of the parties' postnuptial agreement before awarding the plaintiff pendente lite alimony, attorney's fees, and expert fees (hereinafter alimony and litigation expenses), which the defendant contends the plaintiff is not entitled to under the agreement. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which were either found by the trial court or are otherwise undisputed, are relevant to our resolution of this appeal. The plaintiff and the defendant married in Greenwich on September 29, 2013. At the time of marriage, the plaintiff was approximately twenty-eight years old, had no children, and had an approximate net worth of $275,400, and the defendant was forty-five years old, had one daughter from a previous marriage, and had an approximate net worth of $32 million.

Nearly four months after their marriage, on January 17, 2014, the parties entered into a postnuptial agreement in hopes that it would "settle questions with respect to certain marital rights and property to prevent strife and to enhance the prospects for marital harmony . . . ." Both parties were represented by separate and independent counsel and made financial disclosures to the other prior to executing the agreement. Pursuant to the agreement, the parties waived any legal right that

they might otherwise have to the property of the other in the event of a "[t]ermination [e]vent," which is defined to include the filing of a dissolution action. The agreement further provides that, should a termination event occur, the parties will have restored to them the value of the individual property[2] that each party brought into the marriage plus the monetary value of any bequest, trust interest, inheritance, gift, insurance benefits, or the like that either party received during the marriage. The defendant also agreed to assume full financial responsibility for any child born to the marriage or adopted by the parties prior to the termination event.

With respect to marital property,[3] the agreement provides that it "shall be distributed to the parties in the same proportion to the value of their respective [i]ndividual [p]roperty (each party's asset value on the [d]ate of [m]arriage plus the monetary value at the date of transfer of any subsequent gifts or inheritance received by either party during marriage and prior to a [t]ermination [e]vent)." With respect to spousal support, the agreement provides that the defendant waives any claim to receive alimony from the plaintiff but agrees to pay the plaintiff alimony, the amount of which is to be determined pursuant to a complex formula that takes into account various factors, including, but not limited to (1) the length of the parties' marriage, (2) whether they conceived children who were born alive, and (3) the amount of individual property returned to the defendant.

Of particular relevance here, the agreement provides that, if a termination event occurs between the fifth and eighth anniversaries of the date of the parties' marriage, a child was conceived prior to the termination event and later born alive, the plaintiff receives "an aggregate of [m]arital [p]roperty and alimony equaling less than $500,000," and "the value of [the defendant's] [i]ndividual [p]roperty restored to him by the court upon the termination of the marriage is in excess of $10,000,000, then . . . [the defendant] will be obligated to pay a minimum of $100,000 of alimony annually to [the plaintiff] until she receives gifts or inheritances having an aggregate value greater than $10,000,000, taking the value of each such gift or inheritance on the date of transfer, whether prior to or after the [t]ermination [e]vent."

The agreement does not expressly address the issue of pendente lite alimony. It defines the term "alimony" as "the dollar amount of the alimony award made by the court *upon the formal termination of the marriage*"; (emphasis added); a definition that would not clearly and unambiguously include an award of pendente lite alimony, which is made during the pendency of the dissolution action, *prior* to the formal termination of the marriage. See, e.g., *Connolly* v. *Connolly*, 191 Conn.

468, 480, 464 A.2d 837 (1983) ("[p]endente lite orders necessarily cease to exist once a final judgment in the dispute has been rendered because their purpose is extinguished at that time"). The agreement also does not discuss attorney's fees or expert fees, except to state that, if a party unsuccessfully challenges the agreement or breaches it, then he or she will be responsible for the other party's attorney's fees.

After the execution of the postnuptial agreement, the parties began what the trial court described as a "fairly affluent" and "bicoastal" lifestyle, with family homes in Greenwich and Malibu, California. They later had two children—a girl, born in 2015, and a boy, born in 2017. During the marriage, the defendant was the sole financial provider for the family, and the plaintiff relied on him entirely for financial support. The defendant, who is self-employed, is involved in a number of business ventures. Specifically, "[h]e manages his own money through an investment [management firm] . . . . He [also] works with the plaintiff's brother on three real estate projects in Los Angeles, [California] . . . [and] founded a not-for-profit solar company . . . . Finally, the defendant serves on two boards of directors for life science companies . . . ." Despite the defendant's numerous business ventures, however, he testified that the parties had, and continue to have, significant " 'cash flow' " issues due to the illiquidity of the defendant's assets.

These " 'cash flow' " problems, as well as the plaintiff's mental health challenges, are two of the factors that precipitated the decline of the parties' marriage. Additionally, on a family trip to Colorado in December, 2018, the plaintiff and the defendant's then teenage daughter were involved in a physical altercation. Subsequently, in April, 2019, the plaintiff and the defendant were involved in a physical altercation, after which the police were called and the plaintiff was arrested.[4]

In July, 2019, the plaintiff admitted herself into Silver Hill Hospital in New Canaan. The plaintiff testified that "she went to Silver Hill Hospital because she realized [that] she needed help after having gone through several difficult situations, including, in November, 2018, losing an election for public office in Malibu [California], shortly thereafter, having her home destroyed [by fire], then, the December, 2018 altercation with her stepdaughter, and, finally, in 2019 . . . a miscarriage." The plaintiff spent thirty days at Silver Hill Hospital and received treatment for a mild cannabis disorder and for managing her emotions.

The plaintiff was discharged from Silver Hill Hospital on August 21, 2019, and commenced this dissolution action two days later. On August 21, the defendant sought and was granted an ex parte restraining order against the plaintiff, barring her from the marital home and from contacting the defendant, his daughter, and

the parties' children. On September 20, 2019, the defendant filed an answer and a cross complaint, seeking, inter alia, enforcement of the parties' postnuptial agreement. The plaintiff thereafter filed separate motions for pendente lite attorney's fees, temporary alimony, and expert fees.[5] In her reply to the defendant's cross complaint, the plaintiff sought avoidance of the parties' postnuptial agreement on a number of grounds, including that the agreement was signed by her under duress, that the defendant did not provide full, fair and reasonable financial disclosure prior to its execution, and that it would be unconscionable to enforce it in light of present circumstances. In response, the defendant filed a motion to bifurcate the trial, arguing that the trial court should first determine the enforceability of the parties' postnuptial agreement before awarding the plaintiff pendente lite alimony and litigation expenses to which she may not be entitled.

The trial court conducted an evidentiary hearing on the parties' motions, after which it issued orders regarding, inter alia, the postnuptial agreement and the pendente lite alimony and litigation expenses. Relying on this court's decision in *Fitzgerald* v. *Fitzgerald*, 169 Conn. 147, 362 A.2d 889 (1975), the trial court concluded, contrary to the defendant's assertion, that it was not required to determine, prior to deciding the motions, whether the postnuptial agreement was enforceable and, if so, whether it precluded an award of pendente lite alimony and litigation expenses. The court further explained that "[t]o preclude pendente lite support in a matter like this, where one party has no income and, during the course of the marriage, was completely reliant on the other for financial support, would work a great injustice by allowing one side to have access to unlimited resources while the other party [is] left to rely on the financial resources and kindness of family and friends. This is contrary to the basic purpose of temporary support [which is] to provide financial support to a spouse in need of [such support] until the entry of a final dissolution [judgment]." The court then found, on the basis of "all the credible evidence," that the defendant has an imputed net income or earnings in the amount of $900,000 annually or $75,000 per month. The court therefore determined that the defendant was "able to provide the plaintiff with the financial support she needs" and awarded the plaintiff temporary alimony in the amount of $20,000 per month, retroactive to October 31, 2019, the date on which she filed her motion for pendente lite alimony.[6]

With respect to the pendente lite attorney's fees and expert fees, the court similarly concluded that, due to the financial disparity between the parties, an award of such fees was proper notwithstanding the defendant's assertion that the requested amount was unreasonable in light of the parties' postnuptial agreement, which, in the defendant's view, would preclude such an award if

the agreement were found to be enforceable. In reaching its determination, the court observed: "The nature of the defendant's occupation and assets is complicated. At this juncture, it seems likely that valuing his assets will require considerable discovery and expert assistance. Further, this case has the added issues involving the [temporary restraining order]. Based on the pertinent evidence, statutory criteria, and the parties' financial affidavits, the court orders the defendant to pay the plaintiff $114,019.99, the current amount owed to her attorneys, and a $250,000 retainer as contributions toward her attorney's fees." The court further ordered the defendant to pay the plaintiff expert fees in the amount of $25,000.

On appeal, the defendant claims that the trial court incorrectly determined that it need not consider the enforceability of the parties' postnuptial agreement prior to awarding the plaintiff pendente lite alimony and litigation expenses. Specifically, the defendant argues that this court "should . . . hold that a nuptial agreement is presumed to be valid and enforceable until the party challenging it successfully demonstrates otherwise" and that no pendente lite alimony or litigation expenses may be awarded until such a demonstration is made. The plaintiff responds that the trial court's decision to award pendente lite alimony and litigation expenses pending final disposition of the dissolution action comports with this court's decision in *Fitzgerald* and this state's public policy.[7] We agree with the plaintiff.

Whether the trial court properly deferred its decision on the enforceability of the parties' postnuptial agreement until the end of trial presents a question of law over which our review is plenary. See, e.g., *Bedrick* v. *Bedrick*, 300 Conn. 691, 697, 17 A.3d 17 (2011); see also *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008) ("[t]he trial court's determination of the proper legal standard in any given case is a question of law subject to our plenary review").

Although it is well established that "[t]he state does not favor divorces . . . [and] [i]ts policy is to maintain the family relation as a life[long] status"; (citation omitted) *McCarthy* v. *Santangelo*, 137 Conn. 410, 412, 78 A.2d 240 (1951); this court has long held that prospective spouses may contract with one another regarding certain issues that may arise in the event of the dissolution of their marriage, so long as the agreement complies with ordinary principles of contract law and does not violate the law or public policy.[8] See, e.g., *Crews* v. *Crews*, 295 Conn. 153, 159–60, 989 A.2d 1060 (2010); *McHugh* v. *McHugh*, 181 Conn. 482, 485–86, 436 A.2d 8 (1980). We previously have explained that prenuptial agreements violate public policy if, for example, they promote, facilitate, or provide an incentive for divorce, or if the agreement or a provision thereof purports to

relieve a prospective spouse of the obligation to support his or her children or the obligation to support his or her spouse throughout the duration of the marriage. See *McHugh* v. *McHugh*, supra, 488–89.

More recently, in *Bedrick* v. *Bedrick*, supra, 300 Conn. 691, this court held that postnuptial agreements, like prenuptial agreements, do not violate public policy but, instead, "realistically acknowledge the high incidence of divorce and its effect [on] our population." Id., 698; see also id., 699 ("[w]ith divorce as likely an outcome of marriage as permanence, we see no logical or compelling reason why public policy should not allow two mature adults to handle their own financial affairs" (internal quotation marks omitted)). At the same time, we also recognized that "spouses [executing a postnuptial agreement] do not contract under the same conditions as either prospective spouses [executing a prenuptial agreement] or spouses who have determined to dissolve their marriage [executing a separation agreement]"; id., 701; and, therefore, that postnuptial agreements require stricter scrutiny in their assessment than do prenuptial agreements. Id., 703. Specifically, we held that "a court may enforce a postnuptial agreement only if it complies with applicable contract principles, and the terms of the agreement are both fair and equitable at the time of execution and not unconscionable at the time of dissolution"; (footnote omitted) id., 703–704; and that "the terms of a postnuptial agreement are fair and equitable at the time of execution if the agreement is made voluntarily, and without any undue influence, fraud, coercion, duress or similar defect. Moreover, each spouse must be given full, fair and reasonable disclosure of the amount, character and value of property, both jointly and separately held, and all of the financial obligations and income of the other spouse." Id, 704. "[I]n determining whether a particular postnuptial agreement is fair and equitable at the time of execution, a court should consider the totality of the circumstances surrounding execution." Id., 705. "[T]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case." (Internal quotation marks omitted.) Id.

Just as we have recognized that spouses must be free to enter into contracts regarding the distribution of property and other financial matters in the event of divorce, we repeatedly have stated that spouses have a continuing duty to support each other throughout the duration of the marriage and, oftentimes, beyond. See, e.g., *Rubin* v. *Rubin*, 204 Conn. 224, 228, 527 A.2d 1184 (1987) ("[t]he purpose of alimony is to meet one's continuing duty to support" (internal quotation marks omitted)); A. Rutkin et al., 8 Connecticut Practice Series: Family Law and Practice with Forms (3d Ed. 2010) § 33:3, p. 35 ("[a]limony . . . is based primarily [on] a continuing duty to support arising out of the obligation of support which the spouses assume toward each other

as a result of the marriage" (footnote omitted)). In particular, pendente lite alimony—also referred to as temporary alimony—ensures that a dependent spouse is supported while the parties are living apart pending the outcome of the dissolution action. See, e.g., *Stern* v. *Stern*, 165 Conn. 190, 196, 332 A.2d 78 (1973) ("[t]he purpose of an order that a husband make payments of support pendente lite to his wife is to afford her a means of livelihood while she is living apart from him pending the determination of the question whether she has a right to separate maintenance").[9] Accordingly, General Statutes § 46b-83[10] authorizes the trial court to award alimony and support pendente lite to either party throughout the duration of a dissolution of marriage proceeding. In determining whether to make an alimony award pendente lite, the court is directed to consider the factors enumerated in General Statutes § 46b-82.[11] See General Statutes § 46b-83 (a).

The trial court also has broad discretion to award attorney's fees or expert fees, pendente lite, if circumstances and justice so require. See General Statutes § 46b-62 (a) ("[i]n any proceeding seeking relief under the provisions of this chapter . . . the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82"); *Eslami* v. *Eslami*, 218 Conn. 801, 818–21, 591 A.2d 411 (1991) (upholding awards of attorney's fees and expert witness fees as within trial court's sound discretion under § 46b-62); *Medvey* v. *Medvey*, 98 Conn. App. 278, 287–88, 908 A.2d 1119 (2006) (concluding that trial court did not abuse its discretion in awarding plaintiff expert witness fees under § 46b-62).

With this legal framework in mind, we turn to the defendant's claim that the trial court improperly declined to address the enforceability of the parties' postnuptial agreement prior to awarding the plaintiff pendente lite alimony and litigation expenses. As previously indicated, in declining the defendant's request to make a finding as to the agreement's enforceability prior to entering pendente lite orders, the trial court relied on this court's decision in *Fitzgerald*. The defendant contends that the trial court's reliance on *Fitzgerald* was misplaced because the agreement in that case was a separation agreement, whereas the agreement in the present case is a postnuptial agreement. We conclude that the distinction drawn by the defendant is one without a difference in the context of the present case and that the trial court properly relied on *Fitzgerald* in ordering the defendant to pay pendente lite alimony and litigation expenses.

In *Fitzgerald*, four months before the plaintiff wife filed a marital dissolution action, the parties entered into a written separation agreement governing alimony and child support—including temporary support—in

contemplation of their approaching divorce. *Fitzgerald* v. *Fitzgerald*, supra, 169 Conn. 148. In her complaint, the plaintiff sought to invalidate the separation agreement and, later, moved for temporary alimony, custody, support, and counsel fees. Id., 149. The trial court, after hearing oral argument on the plaintiff's motion, ordered the defendant to pay the plaintiff temporary alimony and child support. Id. In so doing, "[t]he court recognized the existence of the separation agreement but ruled that its validity and effectiveness [were matters] to be determined at the time of trial on the merits of the plaintiff's complaint, which, in the first count, concerned the validity of the [agreement] and, in the second count, the divorce action. The court concluded that the validity and effectiveness of the [agreement] need not be determined in awarding temporary alimony and support." Id., 150.

On appeal to this court, the defendant argued, inter alia, that the trial court erred in failing to determine the enforceability of the separation agreement prior to ruling on the plaintiff's request for pendente lite support. See id. ("[t]he defendant's principal contention . . . is that the court erred in refusing to determine the validity of the separation agreement prior to ordering [him], contrary to that agreement, to pay temporary support"). We disagreed, reasoning that "[t]he court's authority to award alimony and support pendente lite at the time of the hearing was expressly provided for [by statute]" and that "[p]ayment pursuant to such an award is to provide for the wife and the dependent children while they are living apart from her husband pending a determination of the issues in the case." Id., 151; see also *Wolk* v. *Wolk*, 191 Conn. 328, 330–31, 464 A.2d 780 (1983) (explaining that pendente lite support is fundamentally different from final orders of support entered at conclusion of dissolution proceeding). We further reasoned that the proper time for a determination as to the enforceability of the parties' separation agreement was "when the case is tried on its merits," because only then "will [the parties] have an opportunity to be heard . . . in a meaningful manner." *Fitzgerald* v. *Fitzgerald*, supra, 169 Conn. 151; see also id., 152 ("[w]hether [certain] trusts may be relied [on] by the defendant to fulfill his primary duty to support his minor children is *for the court to decide upon the full hearing of the case, that is, when it is determined by the court whether the separation agreement is valid* and, if so found, whether [it] is fair and equitable under all the circumstances" (emphasis added)).

We find no merit in the defendant's contention that *Fitzgerald* is distinguishable because it involved a separation agreement rather than a postnuptial agreement. The underlying principle in *Fitzgerald*—namely, that a determination regarding the validity of an agreement may be made when the case is tried on its merits— applies equally to any marital agreement, regardless of

whether it is a prenuptial, postnuptial, or separation agreement. Nor do we agree with the defendant that this court "signaled" in *Bedrick* "that reliance on *Fitzgerald* in the context of postnuptial agreements is misplaced." Indeed, to the extent that *Bedrick* is relevant at all, it is to underscore the propriety of the trial court's decision in the present case.

In *Bedrick*, we were required to determine whether a postnuptial agreement is per se violative of public policy and, therefore, unenforceable. See *Bedrick* v. *Bedrick*, supra, 300 Conn. 693. In deciding that issue, we explained that there are three types of marital agreements—prenuptial, postnuptial, and separation—and that, although separation agreements and postnuptial agreements are both entered into during the marriage, they are distinguishable insofar as one is entered into in contemplation of divorce, whereas the other is entered into "after a couple weds, but before they separate, when the spouses plan to continue their marriage . . . and when separation or divorce is not imminent." (Citation omitted; internal quotation marks omitted.) Id., 693 n.1. We ultimately concluded that the differences were significant enough to require that a higher level of scrutiny be applied to postnuptial agreements than is applied to the other two agreements. Id., 703–704. Specifically, we explained that, "[b]ecause of the nature of the marital relationship, the spouses to a postnuptial agreement may not be as cautious in contracting with one another as they would be with prospective spouses, and they are certainly less cautious than they would be with an ordinary contracting party. With lessened caution comes greater potential for one spouse to take advantage of the other." Id., 703.

We further stated that spouses entering into a postnuptial agreement "do not contract under the same conditions as either prospective spouses or spouses who have determined to dissolve their marriage," meaning that "a postnuptial agreement stands on a different footing from both a [prenuptial agreement] and a separation agreement. Before marriage, the parties have greater freedom to reject an unsatisfactory [prenuptial agreement]. . . .

"A separation agreement, in turn, is negotiated when a marriage has failed and the spouses intend a permanent separation or marital dissolution. . . . The circumstances surrounding [postnuptial] agreements in contrast are pregnant with the opportunity for one party to use the threat of dissolution to bargain themselves into positions of advantage." (Internal quotation marks omitted.) Id., 701; see also id., 703 ("Prospective spouses share a confidential relationship . . . but spouses share the institution of marriage, one of the most fundamental of human relationships . . . . Courts simply should not countenance either party to such a unique human relationship dealing with each other at arms'

length." (Citations omitted; internal quotation marks omitted.)).

The defendant does not explain, nor can we perceive, how this court's statements in *Bedrick* explaining the differences between the three types of marital agreements takes this case outside of the holding in *Fitzgerald* that the validity of marital agreements should be assessed when the case is tried on its merits, or how it otherwise informs the question of when the trial court should decide the enforceability of a postnuptial agreement. However, to the extent that *Bedrick* has any bearing at all on that question, we believe that it reinforces our conclusion that the trial court acted within its discretion in deferring its decision until the end of trial given that, under *Bedrick*, the court is required to conduct a more searching inquiry into the circumstances surrounding the postnuptial agreement's execution than the trial court in *Fitzgerald* was required to undertake with respect to the separation agreement in that case.[12] See id., 703–704.

Indeed, as the trial court noted, because of the complexity of the defendant's finances, valuing his assets—a necessary step in determining the enforceability of the postnuptial agreement—will likely require considerable discovery and expert assistance, a process that could take a good deal of time during which, under the bifurcated approach advocated by the defendant, the plaintiff would be left without the means to support herself, to pay an attorney, and to hire an expert to make sense of the defendant's complicated finances.[13]

In reaching our conclusion, we are mindful that the "the question of whether enforcement of [a postnuptial] agreement would be unconscionable is analogous to determining whether enforcement of an agreement would work an injustice. . . . Marriage, by its very nature, is subject to unforeseeable developments, and no agreement can possibly anticipate all future events. Unforeseen changes in the relationship, such as having a child, loss of employment or moving to another state, may render enforcement of the agreement unconscionable." (Citation omitted.) Id., 706. This is why we held in *Bedrick* that "a court may enforce a postnuptial agreement only if it . . . [is] not unconscionable *at the time of dissolution*." (Emphasis added; footnote omitted.) Id., 703–704. We are not prepared to say that unforeseen changes cannot also occur during the pendency of a divorce action. This is all the more reason why the trial court's broad equitable powers and discretion in deciding matters arising in a dissolution action must include the discretion to postpone a decision as to the enforceability of a marital agreement until the parties have had a full and fair opportunity to litigate all issues in the case at a trial on the merits.[14] See, e.g., *Loughlin* v. *Loughlin*, 280 Conn. 632, 641, 910 A.2d 963 (2006) ("Although created by statute, a dissolution

action is essentially equitable in nature. . . . The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances [that] arise out of the dissolution of a marriage. . . . [I]n the exercise of its inherent equitable powers it may also consider any other factors [besides those enumerated in the statute that] may be appropriate for a just and equitable resolution of the marital dispute." (Internal quotation marks omitted.)); *Gluck* v. *Gluck*, 181 Conn. 225, 228, 435 A.2d 35 (1980) ("[a] dissolution of a marriage, although a creature of statute, is essentially an equitable action").

The defendant contends that our decision today could work an injustice because, if the trial court ultimately determines that the postnuptial agreement is enforceable and, further, that it precludes the award of the pendente lite alimony and litigation expenses at issue, he may be unable to obtain restitution for the pendente lite alimony and litigation expenses he was required to pay the plaintiff throughout the course of the litigation. The defendant argues that the trial court's decision is "particularly harmful where, as here, the plaintiff . . . is without the means necessary to repay the defendant if the agreement is ultimately enforced."

We are not unsympathetic to the defendant's argument and recognize the possibility that he may not be made entirely whole in the event that the trial court determines that the parties' postnuptial agreement is enforceable under the criteria set forth in *Bedrick* for determining that question and that its provisions, in fact, preclude the award of the pendente lite alimony or litigation expenses at issue. Even if this scenario occurs, however, the defendant may not be without any remedy. For example, the trial court could ultimately adjust any financial orders to compensate the defendant for pendente lite payments that were made in contravention of the terms of the agreement, should it be found to be enforceable and should the court, in the exercise of its discretion, determine that such a remedy is warranted. See *Volid* v. *Volid*, 6 Ill. App. 3d 386, 393, 286 N.E.2d 42 (1972) ("[t]he [trial] court in the exercise of its discretion awarded temporary alimony . . . [but] [t]he order should have contained a provision that any temporary sums for [the wife's] support [that] are paid will ultimately be deducted from the lump sum settlement agreed to by the parties [in their prenuptial agreement]").

Moreover, by our decision today, we do not foreclose the ability of the trial court to decide the enforceability of a marital agreement in connection with a request for pendente lite alimony or litigation expenses if the court determines, in its considered judgment, that a decision can be made at that time without doing an injustice to either party. See *Clarke* v. *Clarke*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FA17-

6031321-S (October 10, 2017) (65 Conn. L. Rptr. 327, 328) (applying prenuptial agreement in connection with request for pendente lite alimony because "enforcement of the premarital agreement . . . is not an issue in dispute; both parties are seeking its enforcement"). In considering such a request, the court is also free to fashion a pendente lite order of alimony or litigation expenses that takes into account the existence of a marital agreement that purports to preclude such support. See *Belcher* v. *Belcher*, 271 So. 2d 7, 9 (Fla. 1972) (provision in prenuptial agreement that purports to contract away spouse's future obligation to pay alimony, litigation expenses, and attorney's fees during separation prior to dissolution of the marriage "is a factor to be considered but not the sole factor, nor conclusive, in a determination of [an award for] support pendente lite" (emphasis omitted)). For the reasons previously set forth, however, we conclude that a trial court is also free to decide to delay a decision on the enforceability of a postnuptial agreement until the conclusion of trial if circumstances and equity so require.

The trial court's orders are affirmed.

In this opinion the other justices concurred.

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained.

** January 27, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Under the postnuptial agreement, individual property is defined as the "monetary value of property, which a party held on the [d]ate of [m]arriage, plus the monetary value on the date of transfer to a party of any bequest, trust interest, inheritance, gift, insurance benefits or the like received by a party after the [d]ate of [m]arriage and prior to a [t]ermination [e]vent . . . ."

[3] Marital property is defined in the postnuptial agreement as "the increase in value of the [i]ndividual [p]roperty of the parties held on the [d]ate of [m]arriage until a [t]ermination [e]vent . . . plus . . . the increase in the monetary value from the date of transfer to a party of any bequest, trust interest, inheritance, gift, insurance benefits or the like received by a party after the [d]ate of [m]arriage until a [t]ermination [e]vent."

[4] There are separate criminal charges pending against the plaintiff that relate to the April, 2019 altercation with the defendant.

[5] Specifically, the plaintiff's motions for pendente lite support requested that the court order the defendant to pay her (1) $25,000 per month in temporary alimony, retroactive to October 31, 2019; (2) $83,242 in past due attorney's fees, $250,000 in prospective attorney's fees, and $100,000 per month, beginning on May 1, 2020, in presumed ongoing attorney's fees; and (3) $25,000 for the retention and utilization of experts.

[6] Initially, the defendant's appeal raised a second claim, specifically, that the trial court abused its discretion in awarding pendente lite alimony and litigation expenses because its attribution of a net income to the defendant of $75,000 per month was in error. The defendant subsequently withdrew this claim, and, therefore, it is not before us on appeal.

[7] The plaintiff also argues, as an alternative ground for affirmance, that enforcing the postnuptial agreement now to preclude pendente lite alimony and litigation expenses on the facts found by the trial court would be unconscionable. As we discuss more fully in this opinion, any hearing on the enforceability of the postnuptial agreement will require extensive pretrial discovery and testimony, including the testimony of various experts. Accordingly, the existing record is inadequate for our review of this claim.

[8] "Prenuptial agreements entered into on or after October 1, 1995, are

governed by the Connecticut Premarital Agreement Act, General Statutes § 46b-36a et seq. The statutory scheme provides that a prenuptial agreement is unenforceable when: (1) the challenger did not enter the agreement voluntarily; (2) the agreement was unconscionable when executed or enforced; (3) the challenger did not receive a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party before execution of the agreement; or (4) the challenger did not have a reasonable opportunity to consult with independent counsel. General Statutes § 46b-36g . . . ." (Citation omitted; internal quotation marks omitted.) *Bedrick* v. *Bedrick*, supra, 300 Conn. 699–700.

[9] We recognize that much of our earlier case law addressing spousal support reflects the outdated and paternalistic gender hierarchy of a bygone era, when it was considered the husband's sole duty to provide for the wife and children. See, e.g., *Cary* v. *Cary*, 112 Conn. 256, 259, 152 A. 302 (1930) ("[t]he common-law obligation of the husband to give support to his wife is the foundation [on] which alimony in this [s]tate rests"). Indeed, earlier versions of our alimony statute provided for the payment of alimony only from the husband to the wife, presumably under a theory that a wife would never have a duty to support her husband. See, e.g., General Statutes (1918 Rev.) § 5287 ("[t]he superior court . . . may order alimony to be paid from the *husband's* income" (emphasis added)). Our current statute, however, provides for an award of alimony to either party; see General Statutes § 46b-82 ("the Superior Court may order *either* of the parties to pay alimony to the other" (emphasis added)); and this court has since emphasized the right of either party to receive such support, depending on the facts and circumstances of each case. See, e.g., *Fattibene* v. *Fattibene*, 183 Conn. 433, 441 n.4, 441 A.2d 3 (1981) ("[t]he Connecticut [alimony] statute avoids the equal protection constitutional infirmity of the statutes of some other states which provide that husbands, but not wives, may be required to pay alimony [by providing that the court can award alimony to either party]"). Moreover, other provisions of our General Statutes require relatives, including spouses, to furnish necessary support to a spouse or a child under the age of eighteen, according to such relative's ability. See General Statutes § 46b-215; see also General Statutes § 17b-745.

[10] General Statutes § 46b-83 (a) provides in relevant part: "At any time after the return day of a complaint under section 46b-45 or 46b-56 or after filing an application under section 46b-61, and after hearing, alimony and support pendente lite may be awarded to either of the parties from the date of the filing of an application therefor with the Superior Court. . . ."

[11] General Statutes § 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider . . . the length of the marriage, the causes for . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties . . . ."

[12] The defendant argues that "the heightened scrutiny afforded postnuptial agreements . . . is nothing more than an obligation to apply the usual criteria that guide the relevant analysis with heightened diligence," arguing that the guideposts used to analyze prenuptial and postnuptial agreements are the same in Connecticut and, therefore, that the heightened scrutiny afforded to postnuptial agreements "fails to present any obstacle to determining their validity and enforceability at a preliminary hearing." (Citation omitted; internal quotation marks omitted.) We are unpersuaded. As we explained, and as the trial court found, such an inquiry will likely take considerable time and consume substantial resources, given the complexity of the defendant's finances, during which the plaintiff would be left without the very funds that she would need to litigate the matter. We can also imagine other issues relating to the enforceability of a marital agreement that can and likely will arise during the pendency of a dissolution action that would be ill-suited to summary adjudication at the pendente lite stage of a dissolution proceeding.

[13] Although the issue is not before us, we note that a number of courts have concluded that "an agreement of the parties that waives or limits the right to request temporary support and attorney's fees to a spouse in need in a pending dissolution action is a violation of public policy." *Khan* v. *Khan*, 79 So. 3d 99, 100 (Fla. App. 2012), citing *Belcher* v. *Belcher*, 271 So. 2d 7 (Fla. 1972); see also *McAlpine* v. *McAlpine*, 679 So. 2d 85, 90 (La. 1996) ("prenuptial waivers of alimony pendente lite [are] void as contrary to the public policy of this [s]tate"). See generally *Furer* v. *Furer*, Docket No. 51198, 2010 WL 3271504, *2 (Nev. June 10, 2010) (decision without published

opinion, 126 Nev. 712, 367 P.3d 770) ("court has discretion in any divorce action to require either party to pay the other party money necessary for temporary maintenance or to enable the other party to participate in the case"). In *McHugh* v. *McHugh*, supra, 181 Conn. 489, this court observed that provisions of a prenuptial agreement purporting to relieve one spouse of the duty to support the other during the marriage have been held to contravene public policy.

[14] The defendant nevertheless argues that, "[a]s our sister states have held . . . [our] policy preferences are chilled when pendente lite relief is ordered that directly contravenes the terms of a nuptial agreement" and that "a majority of jurisdictions hold a preliminary hearing on the validity and enforceability of a nuptial agreement when the existence of such an agreement is [pleaded] as part of the dissolution action or [when] it is raised as a defense to pendente lite support." In support of this argument, the defendant cites a number of out-of-state cases, most of which are unreported, that he claims ought to persuade us to adopt the rule he advocates. Two of these cases, however, do not involve pendente lite support or a request for a preliminary hearing to determine the enforceability of a marital agreement. See *Volid* v. *Volid*, 6 Ill. App. 3d 386, 286 N.E.2d 42 (1972); *Ware* v. *Ware*, 224 W. Va. 599, 687 S.E.2d 382 (2009). These cases, therefore, have no value in the context of the present case. Some of the cases that do touch on the issue before us are inapposite because those states have criteria for evaluating the enforceability of marital agreements that are different from our own. See *Bamberger* v. *Hines*, Docket Nos. 2007-CA-000933-MR and 2007-CA-000992-MR, 2009 WL 1025122 (Ky. App. April 17, 2009); *Darr* v. *Darr*, 950 S.W.2d 867 (Mo. App. 1997); *Colon* v. *Colon*, Docket No. A-5986-02T5, 2006 WL 2318250 (N.J. Super. App. Div. August 11, 2006); *Simeone* v. *Simeone*, 525 Pa. 392, 581 A.2d 162 (1990); *Howell* v. *Howell*, Docket No. M2019-01205-COA-R3-CV, 2021 WL 408862 (Tenn. App. February 5, 2021), appeal denied, Tennessee Supreme Court, Docket No. M2019-01205-SC-R11-CV (May 12, 2021); *Gust* v. *Gust*, Docket Nos. 0901-15-2 and 0024-16-2, 2016 WL 2636612 (Va. App. May 10, 2016). To whatever extent any of the cited cases apply a similar framework to our own in evaluating marital agreements and nevertheless require that courts determine the enforceability of the agreement prior to awarding pendente lite support, such as *Trbovich* v. *Trbovich*, 122 App. Div. 3d 1381, 1383–84, 997 N.Y.S.2d 855 (2014), those courts are free to do as they see fit with respect to these matters. We remain convinced that our approach is the better course.

––––––––––––––––––––––––––––